United States Court of Appeals
Fifth Circuit

**F I L E D**

May 30, 2003

Charles R. Fulbruge III
Clerk

In the

# United States Court of Appeals
## for the Fifth Circuit

————————

m 02-10741
Summary Calendar

————————

WILLIAM FRIEND; MICHELLE HUCKABY; ETHEL CARTER; GLORIACOLAS;
CHERRY POPE; PAUL SAMPLES; DIAN ROLAND; DEBORAH BEASLEY; LARRY KING;
MELODY KING; COREY HUCKABY; AND JANE JONES,

Plaintiffs-Appellants,

VERSUS

INTERIOR SYSTEMS, INC.,
ALSO KNOWN AS ISI PROFESSIONAL SERVICES, INC.,
AND
CUSHMAN & WAKEFIELD NATIONAL CORPORATION,

Defendants-Appellees.

————————————————

Appeal from the United States District Court
for the Northern District of Texas
m 3:00-CV-2170-P

————————————

Before HIGGINBOTHAM, SMITH, and CLEMENT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Plaintiffs William Friend, Michelle Huckaby, Ethel Carter, Gloria Colas, Cherry Pope, Paul Samples, Dian Roland, Deborah Beasley, Larry King, Melody King, Corey Huckaby, and Jane Jones, who are black former employees of defendants Interior Systems, Inc. ("ISI"), and Cushman & Wakefield, Inc. ("Cushman"), appeal a summary judgment on their claims of discrimination under 42 U.S.C. § 1981. Finding no error, we affirm.

## I.

Plaintiffs were employed at different times, and in various capacities, by Cushman and ISI at a mail sorting facility on Alpha Road in Dallas, Texas ("Alpha Road Facility").[2] The Alpha Road Facility provided customers with various mail sorting services. In particular, because the United States Postal Service ("USPS") offers a discount in postal rates to customers who sort their own bulk mail, clients had their mail sorted at the facility before sending it to the USPS. To cover the costs of postage, clients were required to deposit money into a trust fund controlled by the USPS.

Alpha Road Facility employees were responsible for reporting to the USPS, submitting postage reports based on the postage required for the bulk mail sorted at the facility. From the reports, the USPS determined the amounts due from various clients and withdrew payment from the trust funds.

In November 1999, ISI learned that the USPS was conducting a criminal investigation into the operation of the Alpha Road Facility. Morton Taubman, ISI's general counsel, was informed by USPS investigators that Roger Ebert, the general manager of the facility, was the target of the investigation, which concerned an alleged payroll fraud scheme and the possible embezzlement of funds from client trust accounts.

Ebert, a white male, was suspended from his position as general manager while ISI conducted its own internal investigation. That investigation uncovered evidence of additional employee wrongdoing. Specifically, Taubman concluded that Friend, Michelle Huckaby, and Martha Litton, an ISI employee not party to this suit, were either involved with Ebert's scheme, or responsible for severe mismanagement of the second shift. Based on these conclusions, ISI terminated Ebert, Litton, Friend, and Huckaby.

The remaining plaintiffs were terminated or quit for various reasons not directly related to the Ebert affair. Five were either laid off or fired in April and May 2000. Another, Jones, quit voluntarily but claims she was constructively discharged.

## II.

On appeal, plaintiffs challenge the summary judgment on their claims of employment

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[2] From October 1997 to July 1999 they were employed by Cushman. At that time, ISI assumed control of the Alpha Road Facility, and all workers at the facility became ISI employees. Cushman eventually resumed responsibility for the operation of the Alpha Road Facility in October 2000, and Jones, the sole plaintiff still working at the facility at that time, became a Cushman employee again.

discrimination.[3]  We review a summary judgment *de novo*, applying the same legal standards as did the district court and viewing all factual questions and inferences in the light most favorable to the nonmoving party. *White v. FCI USA, Inc.*, 319 F.3d 672, 674 (5th Cir. 2003).  Summary judgment is appropriate if, in light of all the evidence, there is "no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Mere assertions of a factual dispute, unsupported by probative evidence, will not prevent summary judgment.[4]  Rather, to demonstrate the existence of a genuine issue of fact, the nonmovant must provide specific facts such that a reasonable jury might return a verdict in his favor. *See Anderson*, 477 U.S. at 248. Consequently, "conclusory allegations, speculation, and unsubstantiated assertions" will not suffice to defeat a motion for summary judgment. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

---

[3] Several claims of discrimination pursued in the district court were not presented in plaintiffs' brief.  Needless to say, we consider only those claims raised and adequately briefed. *See Melton v. Teachers Ins. & Annuity Ass'n*, 114 F.3d 557, 561 (5th Cir. 1997) ("[I]ssues not raised or argued in the brief are considered waived and thus will not be noticed or entertained by this Court on appeal.").  Plaintiffs likewise failed to challenge the denial of their FLSA claims and entirely omitted any discussion of the entry of judgment against Beasley, Huckaby, Larry King, and Melody King. We therefore deem these claims abandoned as well.

[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993).

Plaintiffs contend that defendants engaged in employment discrimination in violation of § 1981(a), which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." The right to "make and enforce contracts," in turn, includes the right to nondiscriminatory enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.  § 1981(b).

### III.

Plaintiffs contend that defendants engaged in racial discrimination in terminating their employment.  Claims of racial discrimination under § 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under title VII. *See Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002) (collecting cases).  Therefore, to determine whether defendants are entitled to summary judgment, we must apply the *McDonnell Douglas* burden shifting analysis. *Id*.

Even assuming *arguendo* that plaintiffs met their burden of establishing a *prima facie* case, ISI advanced multiple legitimate, nondiscriminatory justifications for its decision to terminate their employment.  Accordingly, the burden fell to plaintiffs to demonstrate that these proffered justifications were merely pretexts for unlawful discrimination. *Id*.  None of the plaintiffs has demonstrated the existence of a genuine issue of material fact with respect to pretext.

### A.

ISI contends that plaintiffs Friend and Huckaby were terminated for possible criminal conduct in connection with Ebert's embezzlement and payroll fraud and for gross

mismanagement of the night shift. Either of these grounds constitutes a legitimate nondiscriminatory basis for plaintiffs' termination.

Friend and Huckaby contend that defendant ISI's proffered justification for their termination, their possible involvement in Ebert's criminal conduct, is pretextual, because Ebert did not implicate them in statements made during the ISI investigation and the subsequent criminal case. Plaintiffs contend that Ebert's conflicting statements give rise to a genuine issue of fact with respect to whether they participated in the scheme.

This argument misses the point, however. The question is not whether Friend and Huckaby participated in Ebert's criminal conduct; rather, the question is whether ISI had a reasonable basis for believing they were involved. Even if ISI's belief that they engaged in criminal misconduct was ultimately incorrect, it may serve as a legitimate, nondiscriminatory reason for their termination "so long as the belief [was] reasonable, not arbitrary, and not a likely pretext for unlawful discrimination." *Bauer v. Albermarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999).

In the course of conducting an internal investigation, ISI uncovered several indications that plaintiffs had participated in Ebert's postage fraud and payroll fraud schemes. As night shift managers, Friend and Huckaby were responsible for completing and depositing postal forms for pick-up by the USPS. Indeed, there is evidence that a high proportion of the forms wrongfully withheld from the USPS were prepared either by Friend or Huckaby. They were likewise responsible for verifying the accuracy of employee time cards and time sheets and thus implicated in the payroll fraud scheme. Further, plaintiffs admitted they had received cash payments from Ebert. These facts provided a reasonable basis for ISI's belief that Friend and Huckaby engaged in criminal wrongdoing.[5]

In any event, ISI also concluded that, even absent criminal malfeasance, the night shift had been grossly mismanaged. In addition to reported violations of company policy, the night shift was considerably less efficient than the day shift, sorting less mail despite recording substantially more overtime than the day shift and frequently calling in additional temporary help. Friend and Huckaby present no argument that this justification for their termination was pretextual. Having shown adequate nondiscriminatory reasons for the decision to terminate Friend and Huckaby, defendants were entitled to summary judgment

---

[5] Friend and Huckaby contend that the ISI investigation was one-sided and discriminatory. In particular, they assert that ISI's failure to investigate allegations that ISI Vice President William Marcellino also participated in Ebert's schemes demonstrates that the investigation served merely to conceal the discriminatory motive underlying their termination. Plaintiffs provide no evidence that any allegations concerning Marcellino were credible or supported by evidence such as that which implicated them.

Further, the investigation which culminated in plaintiffs termination resulted also in the termination of two white employees, Ebert and Litton. Plaintiffs' conclusional assertions of discrimination in the conduct of the investigation are not sufficient, in the absence of supporting evidence, to defeat summary judgment. *See Douglass*, 79 F.3d at 1429.

on their claims.[6]

### B.

Carter contends that her termination by ISI was racially discriminatory. ISI, however, presented internal memoranda establishing that Carter was terminated for well-documented, nondiscriminatory reasons, including poor job knowledge, poor leadership, poor decisionmaking, unprofessional and disruptive behavior toward other employees, refusal to work mandatory overtime, and unexcused absenteeism. Although Carter testified that these documents contained "a bunch of lies," her testimony alone does not constitute sufficient evidence of pretext to defeat summary judgment.

### C.

Samples likewise alleges that his termination was motivated by racial discrimination. In response, ISI provided documentary evidence showing that Samples was put on probation for leaving work without permission and that he failed to appear for work the very next day. ISI then sent a termination letter to Samples explaining that he was terminated for poor work performance and nonattendance. Samples failed to introduce any evidence that this legitimate, nondiscriminatory justification for his firing

was pretextual.

### D.

Colas, Roland, and Pope contend their layoffs were the result of racial discrimination. Even assuming plaintiffs have made a *prima facie* showing of discrimination, ISI contends that it decided to lay off the entire second shift because of the inefficiency of the night shift and a drop in business after the allegations concerning Ebert's mail fraud scheme became public. None of the laid off plaintiffs presented evidence that this nondiscriminatory justification for the termination was a pretext for racial discrimination.[7]

### IV.

Friend, Huckaby, Colas, and Pope argue that they were fired in retaliation for their participation in a company meeting held by ISI President Earl Jenkins to address the Alpha Road employees' complaints of racial discrimination. Claims for retaliatory discharge under § 1981 are governed by the same rules as are retaliation claims brought under title VII. *Foley v. Univ. of Houston Sys.*, 324 F.3d 310, 316 n.7 (5th Cir. 2003). Therefore, to assert a *prima facie* claim for retaliation under § 1981, a plaintiff must establish (1) that he engaged in conduct protected by the statute; (2) that his employer

---

[6] Friend and Huckaby contend that summary judgment is inappropriate in light of *Reeves v. Sanderson*, 530 U.S. 133, 147-49 (2000), in which the Court held that a showing of pretext, once made, may be powerful circumstantial evidence of intentional discrimination. That holding is inapplicable here, because, as discussed above, Friend and Huckaby have failed to demonstrate pretext. Although the Court in *Reeves* also held that the lower court had improperly disregarded certain evidence favorable to the plaintiff, *id*. at 152-53, plaintiffs have introduced no comparable evidence.

[7] The laid off plaintiffs' principal evidence of discriminatory intent is Colas' unsubstantiated allegation that Carlos Galvan, an Hispanic supervisor, remarked that they were going to fire all of the black employees if given a chance. Even if admissible, this testimony is not direct evidence that the layoffs in question were discriminatory. Nor, taking the record as a whole, does this statement serve as evidence that the proffered justifications for the layoffs were pretextual, especially in light of the fact that Hispanic employees were laid off as well.

took an adverse employment action; and (3) that the protected conduct and the adverse employment action were causally linked. *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).

Even assuming plaintiffs can make a *prima facie* showing of retaliation, however, defendants have proffered legitimate, nondiscriminatory reasons for their termination. Therefore, "the focus shifts to the ultimate question of whether the defendant[s] unlawfully retaliated against the plaintiff." *Id.* at 305. Neither Colas nor Pope has offered anything more than her own speculation as evidence of a connection between their attendance at the meeting and their subsequent terminations over a month later.

The retaliation claims of Friend and Huckaby require additional analysis, however, because "this circuit has held that where there is a close timing between an employee's protected activity and an adverse employment action, the employer must offer 'a legitimate non-discriminatory reason that explains both the adverse action *and the timing*.'" *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408 (5th Cir. 1999) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)). In the case of Friend and Huckaby, the timing is extremely closeSSthey were terminated on the very day of the meeting.

As discussed above, however, defendants have asserted legitimate, nondiscriminatory justifications for terminating Friend and Huckaby. Further, the closeness in timing of the meeting and the terminations does not give rise in this case to any inference of retaliatory intent. The meeting was called to address the Alpha Road employees complaints of racial discrimination, complaints related to the conduct of an investigation into the mismanagement and fraud occurring on the night shift. The closeness in timing is therefore explained by the fact that the meeting and the terminations arose from the same events and circumstances.

V.

Several plaintiffs also claim they were subjected to racial harassment while employed at the Alpha Road Facility. To establish an actionable claim of racial harassment under § 1981, plaintiffs must demonstrate that (1) they belong to a protected class; (2) they were subjected to unwelcome harassment; (3) the harassment was based on race; and (4) the harassment affected a term, condition, or privilege of employment. *Felton v. Polles*, 315 F.3d 470, 484 (5th Cir. 2002). To affect a term, condition, or privilege of employment harassment must be so severe or pervasive that it creates an abusive work environment. *See id.* at 485.

Plaintiffs allege that Hispanic co-workers made comments to the effect that Hispanics were superior and that the black employees should learn to speak Spanish. Such statements, while obnoxious and offensive, do not amount to discriminatory conduct so severe or pervasive that it created an abusive work environment. It is not enough that plaintiffs found the comments offensive. *See Shepherd v. Comptroller of Accounts*, 168 F.3d 871, 874 (5th Cir. 1999). Teasing and offhand comments do not by themselves create an abusive work environment. *See id.*

Jones, however, alleges additional harassing conduct that she contends demonstrate a racially hostile environment. She alleges that the Hispanic employees were cold and unfriendly to her and that she felt like an

outsider. Further, on three separate occasions, Jones was involved in disputes with Hispanic coworkers. Jones claims that on one occasion a Hispanic employee intentionally hit her with a mail cart and that on another occasion another employee hit her head with his elbow, prompting her to push him in response. Finally, Jones alleges that after she accidentally hit another employee several times, that employee, Maria Macias, responded by intentionally striking her in the leg.

After the last confrontation, her supervisor told her to take a few days off while they investigated the incident. A human resources manager interviewed witnesses but was unable to resolve the conflicting accounts. Consequently, neither Jones nor the other employee was cited for the incident, and Jones was directed to report for work. When Jones returned to the Alpha Road facility to collect some paperwork, she encountered Macias, and the two women began yelling at each other. Jones departed shortly thereafter and did not subsequently come back to work. After Jones failed to report for five days, Cushman terminated her employment.

Even accepted as true, this sequence of events does not constitute actionable racial harassment. First, the Hispanic employees' conduct in excluding her from conversation cannot be characterized as having created an abusive work environment.[8] Nor do three separate disputes with other individual employees, constitute severe or pervasive harassment. In any event, Jones fails to provide evidence that any of her disputes with

---

[8] *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment . . . .").

other employees were motivated by race. Consequently, Jones has failed to state a claim for racial harassment under § 1981.[9]

## VI.

Plaintiffs Roland and Carter contend that the terms of their employment were discriminatory. Roland asserts that she was discriminated against with respect to her work load and pay by virtue of the fact that she worked on the mostly black second shift.[10] She introduces no evidence to support this claim. Similarly, Carter claims that the employees on the day shift were treated better than employees on the night shift. Specifically, Carter contends that employees on the day shift received shirts, smocks, beepers, and big screen TV's. There is no evidence supporting her contention that the day shift actually received such items, much less that these items were distributed on a racially discriminatory basis.

Additionally, several plaintiffs claim that ISI racially discriminated against them by refusing to grant their requests for transfers to the first

---

[9] Having failed to allege the existence of harassment sufficient to constitute a hostile work environment, Jones cannot succeed on her claim that she was constructively discharged. Discrimination alone, without aggravating factors, is not sufficient for a claim of constructive discharge. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001). Indeed, constructive discharge requires a greater degree of harassment than that required by a hostile environment claim. *Id.*; *Benningfield v. City of Houston*, 157 F.3d 369, 378 (5th Cir. 1998).

[10] Roland also complains that she was denied a promotion because she spent time training other employees, but makes no attempt to explain how this denial was racially discriminatory.

shift. These claims provide no basis for a claim of racial discrimination under § 1981, however, because failure to transfer does not rise to the level of an adverse employment action. *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999).[11]

AFFIRMED.

---

[11] Because we affirm the summary judgment for Cushman and ISI on all claims, we need not address plaintiffs' contention that the district court erred in failing to hold them jointly and severally liable.